## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TONYA EGGLESTON,
KAITLYN HOGE, ALLIDELL
JACKSON, JUDELYN EBUDA,
INDIVIDUALLY, AND ON
BEHALF OF A CLASS OF
SIMILARLY SITUATED
INDIVIDUALS,

       Plaintiffs,

       v.

LHNH LAVISTA LLC, LHNH
LAVISTA TIC II LLC, LHNH
LAVISTA TIC III LLC,
SILVERPOINT
MANAGEMENT, LLC, AND
AVENIUM GROUP, LLC,

       Defendants.

Case No. _____

**RELATED ACTION**
**CASE No. 1:23-cv-05344-LMM[1]**

## CLASS ACTION COMPLAINT

    Plaintiffs Tonya Eggleston, Kaitlyn Hoge, Allidell Jackson, Judelyn

Ebuda, individually and on behalf of a class of similarly situated individuals, file

this class action complaint against Defendants and show the Court the following:

---

[1] Plaintiffs are putative class members in a pending class action. This is a protective filing, out of an abundance of caution, due to the two-year statute of limitations on Plaintiffs and the putative class's claims under Georgia's premises liability statute.

## PARTIES

### 1.

Tonya Eggleston is a former resident of The Reserve at LaVista Walk and citizen of the State of Georgia. Ms. Eggleston submits to the jurisdiction of this Court.

### 2.

Kaitlyn Hoge is a former resident of The Reserve at LaVista Walk and citizen of the State of Georgia. Ms. Hoge submits to the jurisdiction of this Court.

### 3.

Allidell Jackson is a former resident of The Reserve at LaVista Walk and citizen of the State of Georgia. Ms. Jackson submits to the jurisdiction of this Court.

### 4.

Judelyn Ebuda is a former resident of The Reserve at LaVista Walk and citizen of the State of Georgia. Ms. Ebuda submits to the jurisdiction of this Court.

### 5.

Tonya Eggleston, Kaitlyn Hoge, Allidell Jackson and Judelyn Ebuda represent a putative class of similarly situated individuals who are residents of Fulton County and lived in Buildings One and Two at The Reserve at LaVista Walk at the time a fire started on the roof on November 10, 2023.

6.

LHNH LAVISTA LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey.  Jurisdiction as to this Defendant in this Court exists per the Order of May 2, 2024 in the Related Case. (Doc. 38). This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

7.

LHNH LAVISTA TIC II LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey.  Jurisdiction as to this Defendant in this Court exists per the Order of May 2, 2024 in the Related Case. (Doc. 38). This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

8.

LHNH LAVISTA TIC III LLC is a New Jersey limited liability company with its principal place of business in Jackson, New Jersey. Jurisdiction as to this Defendant in this Court exists per the Order of May 2, 2024 in the Related Case. (Doc. 38).  This Defendant may be served by personal service of process upon its

registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

9.

Silverpoint Management, LLC, is a New Jersey limited liability company with its principal place of business in Lakewood, New Jersey.  Jurisdiction as to this Defendant in this Court exists per the Order of May 2, 2024 in the Related Case. (Doc. 38). This Defendant may be served by personal service of process upon its registered agent, Vcorp Agent Services, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

10.

Avenium Group, LLC, is a New Jersey limited liability company that is not registered to do business in Georgia with the Secretary of State.  Its principal place of business is in Jackson, New Jersey.  Jurisdiction as to this Defendant in this Court exists per the Order of May 2, 2024 in the Related Case. (Doc. 38). This Defendant may be served with personal service of process upon its registered agent, Yakov Stein, 2105 W. County Line Road, Ste. 3, Jackson, New Jersey 08527.

## JURISDICTION AND VENUE

### 11.

This action has more than one hundred putative class members, the parties are minimally diverse, and the matter of controversy is in excess of $5 million.

### 12.

As a result, this Court has original diversity jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (d)(5). *See also Standard Fire Ins. Co. v. Knowles*, 568 U.S 588 (2013). Jurisdiction as to this Defendant in this Court exists per the Order of May 2, 2024 in the Related Case. (Doc. 38).

### 13.

Venue is appropriate in the Northern District of Georgia, Atlanta Division, because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" within the bounds of the Atlanta Division, and all Plaintiffs reside therein. 28 U.S.C. § 1391; N.D. Ga. L.R. 3.1(B).

## BACKGROUND

14.

Defendants LHNH LAVISTA LLC, LHNH LAVISTA TIC II LLC, and LHNH LAVISTA TIC III LLC (collectively, "the LHNH Defendants") purchased The Reserve at LaVista Walk ("Lavista Walk") located at 1155 LaVista Road NE, Atlanta, Georgia 30324 in December 2021.

15.

On November 10, 2023, Lavista Walk caught fire and was severely damaged. The fire originated from fireworks launched onto the roof of LaVista Walk.

16.

Lavista Walk consists of two four-story apartment buildings ("Building 1" and "Building 2") with 283 total units. There is a four-story parking deck between the buildings. Lavista Walk is in an area that has one of the highest crime rates in Georgia.

17.

LaVista Walk shared a property line with a retail "76" gas station located at 2319 Cheshire Bridge Road, Atlanta, Georgia. It is illegal to shoot fireworks at Lavista Walk because it is within 100 yards of a gas station that stores more than

500 gallons of flammable liquid.  See O.C.G.A. § 26-10-2(b)(3)(C)(iii). It is also against the terms of the form lease that a resident signs.

18.

Fireworks were discharged on the property on a several occasions prior to the fire, including around the New Years Eve and July 4th holidays.  Defendants had notice of fireworks being detonated on the property prior to November 10, 2023 but did nothing to stop it or take preventative action against future fireworks incidents even though it was dangerous, illegal, and a violation of the terms of the lease.

**DEFENDANTS WERE ON ACTUAL NOTICE OF AT LEAST TWO INCIDENTS WHERE INDIVIDUALS DISCHARGED FIREWORKS ON THE ROOF, ONE OF WHICH INVOLVED TENANT CHARNELLE GUNN**

19.

On or around July 4, 2023, tenant Frida Flores woke up in the evening to loud fireworks at the Reserve at Lavista Walk.  When she looked out of her window, she observed and filmed with her phone fireworks being used on the parking deck adjacent to the roof where the fireworks ultimately caused the fire 4 months later on November 10, 2023.  Ms. Flores reported the use of fireworks to Defendants property management.

20.

A day or two later, another tenant, Kenkero Peterson, observed tenant Charnelle Gunn speeding through the parking deck and discharging fireworks with her son from the same parking structure onto the same roof.

21.

A day or two later, Ms. Peterson lodged a formal complaint with leasing agent Deyse Mejia, and other agents of Defendants who were present in the Leasing Office that Ms. Gunn's actions presented a fire hazard.

22.

Prior to that time, Ms. Peterson had lodged other complaints that Ms. Gunn presented a safety risk to other tenants.

23.

Residents reported tenant Charnelle Gunn shooting fireworks on the property, driving erratically and too fast in the parking deck. After learning of an incident where Ms. Gunn was physically assaulted on the property, property management determined that she brought crime to the property. Despite notice and knowledge that Charnelle Gunn posed a safety threat to the residents, was in violation of the terms of her lease, and brought crime to the property, Defendants failed to evict or

otherwise remove Ms. Gunn from the property or in any way prevent her from shooting fireworks or committing or bringing crime to the property.

## DEFENDANTS WERE ON NOTICE OF NUMEROUS CRIMES ON THE PREMISES BUT DID NOT PROVIDE REASONABLE SECURITY TO PROTECT THE RESIDENTS OF LAVISTA WALK

24.

Residents lodged hundreds of complaints with Defendants and Defendants' agents and employees since Defendants purchased and began managing The Reserve at Lavista Walk for, among other things, the following: gun shooting, armed robberies, noise violations, intrusions into the complex via unsecured gates, broken doors, broken gates, broken fence, trespassers, vagrants, homeless climbing the walls to the upper parking decks and roofs, fireworks being used on and near the roof adjacent to the visitor parking lot, residents and non-residents throwing parties with alcohol and loud music at the pool and other areas of the complex, hit and runs, assaults on residents and their guests by tenants and non-tenants alike, arson, apartment and vehicle vandalism and break-ins, mailbox break-ins, gang activity, graffiti, fire extinguisher theft, drug usage, drug dealers carrying automatic weapons through the complex and selling drugs from apartments rented to them by Defendants, pests, mold, rats eating the wiring and constant malfunctions of the fire suppression system.

25.

To protect the property and the Residents who lived there, Defendants initially retained two security companies employed by, on information and belief, a company called Greystar Management ("Greystar"), the prior owner of Lavista Walk. Greystar had contracted with a security company that provided daily patrols of the property and would be on site to respond to criminal or dangerous activity occurring on the property, a security company that provided 24/7 monitoring of the 24-32 surveillance cameras spread throughout the property and a courtesy officer who was an off-duty Atlanta PD officer who lived at Lavista Walk. The courtesy officer was available to answer calls from residents and help property management with evictions. The courtesy officer would be at the complex when he was not working for Atlanta PD but was not required to perform regular patrols of the property.

26.

Defendants' first property manager, Patricia Cosby, determined, after a few months, that there was a problem with crime and trespassing on the property and requested that ownership approve the hiring of a second courtesy officer. Instead of adding security, Defendants fired the security companies to cut costs. Defendants did hire another courtesy officer who would often be off property working full-time

for the Atlanta PD.  At that point, there was no one monitoring the surveillance cameras and no security regularly patrolling the property.

27.

At least by August 2022, the Defendants recognized they had a serious security problem at The Reserve at LaVista Walk. Property Manager Melvin Coleman determined that there was a need for additional security due to the crime and dangerous activity that was occurring on the property.  Mr. Coleman sought and received evaluations and/or bids from 6 security companies who recommended armed guards, regular patrols, camera monitoring, talk-downs speakers from the cameras and other methods to prevent crime and/or dangerous activity from occurring on the property.  On August 17, 2022, Mr. Coleman, sent an e-mail to corporate officers with several security proposals.

28.

The same day, David Helfgott, VP of Operations for Silverpoint Management responded with a request that the companies provide an assessment of what they feel is needed.  Although he noted that local management believed strongly that the apartment complex needed armed guards, he wanted assessments from prospective security companies before agreeing to spend money for the requested armed security guards.

11

29.

On August 24, 2022, an assistant property manager, Nakia Glenn, e-mailed two security assessments to Melvin Coleman, noting that both companies recommended two guards patrolling seven days a week but that this would be pricey.

30.

One of the security assessment reports provided to Defendants' management was prepared by DBest Security. The DBest Security report assessed the overall security threat as "moderately high," noting that prior incidents included "arson," "minor arson," "property damage," and "disorder."

31.

On October 25, 2022, Coleman sent an e-mail in response to an inquiry from Stephanie Johnston, a regional manager with Silverpoint, confirming there was still "no physical security" at The Reserve at LaVista Walk.

32.

On December 20, 2022, Coleman sent an e-mail to Johnston inquiring if "we could investigate hiring a security company temporarily until the activity on the property changes" and noted that the "amount of activity" on Friday, Saturday, and Sunday nights was "too much for one person" and "just last night three vehicles were broken into."

33.

Johnston replied, "I understand your concern and am with you that we need to do something, however the funds are not there to hire a security company."

34.

Instead of hiring additional security, Defendants hired companies to renovate and remodel the property and apartments to entice a buyer.

35.

Defendants failed and/or refused to fix broken or damaged fences, gates, doors, and locks allowing trespassers/homeless to access buildings, apartments, the parking deck and the roofs of the buildings.

36.

Residents complained to Defendants agents/employees that residents and non-residents were able to access the roof, ignite fireworks, and discharge firearms.

37.

Defendants failed to adequately address the severe security and safety issues that they were aware of (including known acts of arson) despite their own agents' and/or employees' knowledge that the apartment complex was in dire need of additional security for the protection of the residents of Lavista Walk.

## DEFENDANTS' LEASE AGREEMENT WITH THE RESIDENTS OF THE RESERVE AT LAVISTA WALK

### 38.

Residents of The Reserve at LaVista Walk, including Plaintiffs, each entered into the same NAA form lease agreement with Defendant LHNH Lavista, LLC.

### 39.

Under the specific terms of the Lease, the residents and/or their guests were prohibited from using or maintaining at the apartment complex any material that may create a fire hazard, including, but not limited fireworks.

### 40.

Likewise, the terms of the Lease prohibited the residents and/or their guests from engaging in the following activities: behaving in a loud manner, disturbing the rights, health or safety of other tenants, guests, or Defendants' agents or employees, possessing or distributing drugs, engaging or threatening violence, and possession of a weapon, and discharging firearms or fireworks at the complex.

### 41.

Engaging in prohibited conduct, such as the use of fireworks, was a material breach of the Lease, giving Defendants the right to terminate the tenant's right of occupancy.

## DEFENDANTS FAILED TO SERVICE, MAINTAIN AND/OR REPAIR THE FIRE SUPPRESSION SYSTEM AT LAVISTA WALK

42.

The alarm system for the apartment complex was often in disrepair and false fire alarms would frequently go off for extended periods of time.

43.

In June 2022, Century Fire Protection, LLC ("Century"), diagnosed two broken control valves that controlled the pressure within the fire suppression system.

44.

Century warned Defendants that the broken control valves meant that the pressure within the fire suppression system could not be guaranteed or maintained.

45.

Upon information and belief, immediately after the two broken control valves were diagnosed, the fire suppression system failed inspection.

46.

Upon information and belief, Century did not return to the apartment complex after June 2022 because Defendants refused to pay outstanding invoices and even threatened to foreclose on the property.

47.

Century and numerous other vendors filed liens on unpaid invoices that Defendants accumulated in their effort to re-sell the property for a substantial profit.

48.

On or about December 24-25, 2022, the fire suppression system froze and caused flooding again.

49.

Defendants were also aware of damaged and non-functional sprinkler heads throughout the hallways of Buildings One and Two.

50.

Defendants had knowledge the fire alarm pull-down boxes and fire extinguishers had not been properly inspected and/or were not all operating.

51.

Defendants had specific knowledge that the fire suppression system was not adequate and not functioning.

52.

Defendants made the conscious choice to not repair the fire suppression system to maximize profits to investors.

53.

Defendants failed to adhere to local, national and state codes, laws, rules, statutes, regulations and/or ordinances with respect to the fire suppression system, including, but not limited to failing to maintain the required number and type of fire extinguishers throughout the premises,  including, but not limited to, on the top level of the parking deck where the subject fireworks were thrown onto the adjacent roof where the fire started in this case, failing to have the fire extinguishers inspected, maintained and tested, failing to train its staff on the proper use of the fire extinguishers or even where the fire extinguishers were supposed to be located and failing to have adequate and proper signage of the fire department connections at the property.

54.

On October 24, 2022, a risk assessment that was performed by the underwriter for Defendants' insurance company informed Defendants that there were fire hazards present at the property.

**THE NOVEMBER 10, 2023 FIRE**

55.

On the night of November 10, 2023, The Reserve at LaVista Walk caught fire. According to reports, the fire originated on the roof of Building One from a firework

that Charnelle Gunn threw from the parking deck in the very same manner that Kenkero Peterson had warned Defendants about in July 2023.

56.

Emergency personnel were notified of the fire at approximately 10:30 p.m., but the earliest evidence of a fire alarm sounding is 10:53 p.m. According to a fire incident report, the fire suppression system failed to provide adequate water pressure and two of the standpipes failed to function.

57.

On the night of the fire, Jennifer Sequira Tercero, an Assistant Manager for Defendants who lived at the complex, went up to the top floor of the visitor parking lot where the fire was initially located with a small fire extinguisher that was located in her apartment.

58.

After she reached the top of the stairs, she walked over 100 feet to where the fire was burning towards the back of the parking lot on the roof adjacent to the parking deck and actively looked for additional fire extinguishers, but she was unable to locate any other fire extinguishers even though such extinguishers were required per applicable law.

59.

Ms. Tercero had not received any training on how to operate fire extinguishers and had not been informed as to where the fire extinguishers were located at the complex, including on the visitor parking deck.

60.

When Ms. Tercero reached the fire, it was very small and circular like a ring of fire, and she believed that the fire could have been contained or extinguished very easily even though she had no experience in extinguishing fires had she had access to additional fire extinguishers.

61.

Ms. Tercero handed a small fire extinguisher, which each resident is supposed to have in their apartment, to the brother of one of the residents at the complex who was standing by the fire, and he attempted to put out the fire with the extinguisher, but the extinguisher ran out of its extinguishing substance within what seemed  a few minutes because it was so small.  As such, they were unable to extinguish the fire and could not locate any other extinguishers on the deck or anywhere near the fire in violation of appliable laws that required fire extinguishers to be present.

62.

Although there were two individuals in management in addition to Ms.

Tercero at Lavista that night, on information and belief, none of these individuals went to the scene of the fire or attempted to extinguish the fire as there simply was not enough staff at Lavista to handle the evacuation and the fire at the same time.

63.

During an inspection of the deck on November 23, 2023, fire extinguishers were missing from several storage cabinets closest to the vicinity of the fire where they should have been housed.

64.

The absence of these fire extinguishers prevented the fire from being extinguished on the roof prior to it spreading throughout Building One.

65.

On information and belief, the roof membrane failed to meet Class A or B fire resistance standards as defined by ASTM E108 and UL 790.

66.

Apartment leasing agents, all of whom were on-site although not all of them lived on-site,[2] manually pulled a fire alarm at a pull box – it is unclear if the fire

---

[2] Residents report that the two leasing agents who do not live on-site are infrequently, if ever, seen at the complex after 6:00 p.m., and residents found it extremely peculiar that they were on-site at the time of the fire before fire personnel.

alarm was not functioning from negligence or had been intentionally disabled as a result of complaints regarding the false alarms.

67.

Prior to November 10, 2023, the fire alarm had gone off numerous times and Defendants falsely told residents that the false alarms were occurring because the system was being tested.

68.

Dozens – reportedly by one resident, more than one hundred – false alarms from the time of the vehicle collision until November 10, 2023, caused many residents to disregard the fire alarm.

69.

Likely knowing that the false alarms created a "boy that cried wolf situation," an Atlanta Police Department ("APD") officer who also lived in the building went door-to-door to inform residents the building was on fire.

70.

The APD officer did not have time to take care of his own apartment unit due to his decision to inform residents of the fire; due to his heroism and sacrifice, no one died in the fire, but his pet cat died, and he lost all of his personal belongings.

71.

Failing to prevent units of Building 1 from being looted after the fire.

72.

Building One residents could not return to their units.

73.

Shortly after the fire, Building Two residents were told that they could not return to the property.

74.

Due to the failure to ensure appropriate security, Building Two was looted with numerous residents complaining that their belongings were either stolen or vandalized before they were allowed to enter their apartments to retrieve their personal belongings. This delay prevented many residents from being able to file timely police reports.

75.

Defendants engaged BluSky Restoration Contractors, LLC ("BluSky") to demolish and/or restore the property without allowing Plaintiffs to inspect the property which constituted spoliation of evidence.

76.

Upon information and belief, Defendants altered the scene to destroy evidence and hamper Plaintiffs' ability to investigate this matter

77.

After the fire rendered the residents homeless, Defendants, using the residents' personal data, unjustly enriched themselves by selling the data to the highest bidding company to use the data to send marketing materials to the residents to convince them to sign leases with this company.

## CLASS ACTION ALLEGATIONS

78.

Plaintiffs bring this action as a putative class action and proposes one class.

79.

Plaintiffs propose the following class, while reserving the right to modify this definition:

> All individuals who (a) resided in Building One or Building Two
> at The Reserve at LaVista Walk on November 10, 2023, and
> (b) suffered personal property damage as a result of the fire that
> took place on November 10, 2023, and/or (c) have not been
> provided a return of their security deposit and/or pro-rated rent

from November 11, 2023, forward.

80.

Plaintiffs propose certification on all issues, while reserving the right to seek, in the alternative, certification as to any specific issue, claim, or defense.

81.

This action has been brought and is properly maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy-of-representation requirements of Fed. R. Civ. P. 23.

82.

Plaintiff alleges that hundreds of individuals who resided at The Reserve at LaVista Walk on November 10, 2023, have been displaced and lost substantial personal property resulting in damages related to the replacement cost of personal property, loss of use of said property, lost wages, loss of capacity to earn wages, annoyance, depression, emotional upset, and other compensatory, general and special damages.

83.

The class members are so numerous that joinder is impracticable. Upon information and belief, Buildings One and Two at The Reserve at LaVista Walk had 284 units, approximately 74.56% occupancy, and approximately 243

residents.

84.

Plaintiffs' claims are typical of the claims of the putative class. Because Plaintiffs were harmed by the same fire resulting from Defendants' negligence that harmed the class, Plaintiffs were subject to conduct that is typical of the rest of the class.

85.

Plaintiffs would adequately protect the class's interests. Plaintiffs have genuine interest in protecting the rights of the class and Plaintiffs' counsel is experienced in handling complex class actions. Because Plaintiffs seek recourse related to a fire that harmed all class members, the interests of Plaintiffs and the class are aligned.

86.

Questions of law and fact common to the putative class exist that predominate over questions affecting only individual members including but not limited to whether Defendants were negligent in failing to properly secure the property to prevent criminal/dangerous activity to occur on the property, failing to protect the residents and their property, to prevent discharge of fireworks on the property, allowing Charlene Gunn to remain on the property after receiving

notice of her committing crimes on the property and bringing crime onto the property that were dangerous and risked the safety of the residents and their property, by refusing, for financial reasons, to secure a functional fire suppression system, including fire extinguishers and properly marked and posted FDC signs. A finding of liability in favor of Plaintiffs would establish Defendants' liability on behalf of all class members damaged by the fire.

87.

A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Given the high cost of litigating the case to judgment relative to the dollar amounts at stake, a class action is likely the only way for Plaintiff and other class members to obtain any redress.

88.

The prosecution of separate actions by or against individual members of the class would create a risk of "(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; [and] (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]" Fed. R.

Civ. P. 23(b)(1).

## COUNT ONE

## Negligence, Gross Negligence, and Negligence Per Se

89.

Plaintiffs hereby re-allege and incorporate paragraphs 1- of 88 this Complaint as if fully set forth herein.

90.

Defendants had a legal duty to exercise reasonable or ordinary care to protect the residents of The Reserve at LaVista Walk from unreasonable risk of harm from fire.

91.

Defendants breached their legal duty by failing to ensure the fire suppression system, and the parts thereof, were operational and working properly, including but not limited to, the fire extinguishers, FDC signage, alarm system, standpipes, roof membrane and sprinkler system

92.

Defendants are "responsible for damages arising from defective construction or for damages arising from the failure to keep the premises in repair." O.C.G.A. § 44-7-14.

93.

Defendants' negligence, gross negligence and negligence per se caused Plaintiffs and those similarly situated to suffer general and special damages, and Plaintiffs and those similarly situated are entitled to these damages in an amount to be proven at trial and as allowed under Georgia law.

## COUNT TWO

## Premises Liability

94.

Plaintiffs hereby re-allege and incorporate paragraphs 1-93 of this Complaint as if fully set forth herein.

95.

At all times material to this action, Plaintiffs were tenants of The Reserve at Lavista Walk (the "Premises").

96.

At all times material to this action, Defendants had a non-delegable duty to properly repair, maintain, inspect, secure, patrol, and manage the Premises.

97.

While Defendants owned and/or managed the Premises, Defendants breached these non-delegable duties and otherwise negligently repaired, maintained, inspected, secured, patrolled, and manage the Premises despite their actual and constructive knowledge of the need to do so.

98.

Prior to the fire of November 10, 2023, Defendants had actual and/or constructive knowledge of crimes such as arson, shootings, use of fireworks, armed robbery, burglaries, drug usage, drug distribution, vandalism, trespassers, vagrants, apartment break-ins, break-ins to the management offices, assaults, batteries, car theft/break ins, damage, fire extinguisher theft and discharge, and the possession and discharge of firearms, etc..

99.

Prior to the fire of November 10, 2023, Defendants had actual knowledge that Charnelle Gunn had illegally set off fireworks on the top of the parking deck, the same place that she ignited fireworks on the evening of the fire, dangerously and

recklessly drove her vehicle in and around the Premises endangering the other tenants and their guests, and otherwise invited and caused crimes to be committed on the Premises and in and around her apartment.

100.

Prior to the fire of November 10, 2023, one of Defendants agents and/or employees noted in an email to Robert Stokes, Charnelle Gunn's uncle, co-tenant, and who also ignited the fireworks that caused the November 10, 2023 fire, that she was aware that Ms. Gunn brought crime onto the property, but refused to allow Ms. Gunn and Mr. Stokes to terminate their lease without paying Defendants the required termination fees. As such, Ms. Gunn was allowed by Defendants to remain a tenant.

101.

Despite having direct knowledge of Charnelle Gunn's illegal and unsafe activities and her endangerment to the other tenants, Defendants failed to take any action whatsoever to prevent her from continuing these activities such as the eviction of Charnelle Gunn and otherwise failed to warn the other tenants of the danger posed by Ms. Gunn.

102.

Despite having actual and constructive knowledge of the numerous crimes that were occurring almost daily at the Premises, including arson, and being

informed by security experts that armed guards were required at the Premises and that other security measures needed to be undertaken, Defendants made the conscious and negligent decision to refrain from undertaking these security measures based on cost alone, and chose to continue to allow the tenants to be subjected to the daily risk of harm that Defendants knew could result from the crimes and other unsafe activities that took place on the Premises.

103.

Prior to the fire of November 10, 2023, Defendants had a non-delegable duty to maintain a properly working fire suppression system, to equip the Premises with legally required fire extinguishers, and to train its staff how to operate the fire suppression system and fire extinguishers and where the fire extinguishers were located.

104.

Defendants were obligated to post properly marked and conspicuous CDC placards to identify connections at Lavista Walk.  Defendants failed to comply with local, state and/or federal laws, codes, statutes, ordinances or other regarding proper CDC signage.

105.

After the fire, Defendants were under a duty to protect the personal property of those in Building One and Building Two.  After the fire, units in Building Two were looted.  Defendants breached their duty to secure the personal property of the Residents of Building Two after the fire.

106.

Despite possession of active and constructive knowledge of fireworks being used on the Premises by Ms. Gunn and various acts of arson and the danger of what could occur without a properly trained staff, an improper fire suppression system that was in dire need of repair, and without the legally required number and type of certified fire extinguishers,  Defendants made the conscious and negligent decision to refrain from fulfilling these non-delegable duties.

107.

Defendants negligently failed to warn Plaintiffs and the putative class about the existence of the aforementioned crimes, the hazard presented by Charlene Gunn remaining a resident of Lavista Walk, lack of security, a fire suppression system that was in disrepair, the lack of legally required fire extinguishers, and that its staff was not trained in basic fire prevention and containment practices and the lack of a proper CDC sign.

108.

At all times pertinent hereto, Defendants and their agents and/or employees had superior knowledge of the unsafe condition of the Premises as described above that proximately caused Plaintiffs to be rendered homeless, the loss of their personal property, and other damages as described herein.

109.

Defendants failed to take appropriate actions to remedy or reduce the danger to their tenants and allowed the dangerous environment on the Premises to continue to exist unabated.

110.

As a direct and proximate result of Defendants' negligent failure to fulfill their non-delegable duties as set forth herein, Plaintiffs and those similarly suffered general and special damages in an amount to be proven at trial and as allowed under Georgia law.

**COUNT FOUR**

**Negligent hiring, training, supervision and retention**

111.

Plaintiffs hereby re-allege and incorporate paragraphs 1-110 of this Complaint as if fully set forth herein.

112.

Because Defendants had knowledge of or, in the exercise of reasonable care, should have had knowledge of the dangerous environment of the Premises and the lack of training of its staff, Defendants are liable for the negligent supervision, hiring, training and retention of their employees and agents operating on the Premises and otherwise vicariously liable for the actions and/or omissions of their employees and/or agents as described herein via the doctrine of *respondeat superior* proximately causing Plaintiffs and those similarly situated to suffer general and special damages in an amount to be proven at trial.

## **COUNT FIVE**

### **Nuisance**

113.

Plaintiffs hereby re-allege and incorporate paragraphs 1-112 of this Complaint as if fully set forth herein.

114.

Defendants' failure to properly inspect, maintain, and repair the Premises created the hazardous conditions that ultimately caused the fire on November 10, 2023 and the inability of their staff and the Atlanta Fire Department to extinguish, maintain or control the fire, its spread and ultimate destruction of the Premises.

115.

The hazardous conditions of the Premises, created by the inadequate maintenance and repair of the Premises, began at the time of Defendants' ownership, management and control of the Premises and continued in time forward that it constituted an ongoing and continuing nuisance to the tenants of The Reserve at Lavista Walk and their guests.

116.

Defendants knew, or in the exercise of ordinary and reasonable care, should have known of the existence of the nuisance, created by the improper repair, maintenance, and/or management of the Premises, but Defendants failed to correct the nuisance within a reasonable time.

117.

Defendants' failure to correct the nuisance was the proximate cause of the general and special damages suffered by Plaintiffs and the putative class members.

118.

Plaintiffs and those similarly situated are entitled to all nuisance damages against Defendants as allowed by law.

119.

Defendants allowed units in Building 1 to be looted for the few days after the fire.

## **COUNT SIX**

## **Punitive Damages**

120.

Plaintiffs hereby re-allege and incorporate paragraphs 1-119 of this Complaint as if fully set forth herein.

121.

The Defendants' actions show wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs and the putative class to an award of attorney fees and punitive damages pursuant to applicable law.Defendants acted with willful misconduct, malice, fraud, oppression, wantoness, and an entire want of care raising the presumption of a conscience indifference to the consequences. Accordingly, Plaintiffs and those similarly situated are entitled to recover punitive damages from Defendants pursuant to O.C.G.A. § 51-12-5.1.

## COUNT SEVEN

### Bad Faith Damages

122.

Plaintiffs hereby re-allege and incorporate paragraphs 1-121 of this Complaint as if fully set forth herein.

123.

Defendants acted in bad faith in the underlying transaction by pursuing profits over safety and have caused Plaintiffs and the putative class unnecessary trouble and expense. As such, Defendants are liable for Plaintiffs' expenses of litigation, including reasonable attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following relief:

(a) Compensation for all financial losses that resulted from the fire, including, but not limited to, the cost to replace all destroyed personal property, loss of use of said property, lost wages for time missed from work to relocate, and expenses related to purchasing replacement items, temporary substitute housing, and permanent substitute housing;

(b)     General damages in an amount to be determined by the enlightened conscience of the jury to fully compensate Plaintiffs and those similarly situated;

(c)     Award for reasonable attorneys' fees and costs of litigation;

(d)     Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendants for their conduct toward Plaintiffs and those similarly situated and deter Defendants from similar conduct in the future;

(e)     Judgment against Defendants for damages incurred by Plaintiffs and those similarly situated;

(f)     Judgment against Defendants in an amount to fully and adequately compensate Plaintiffs and those similarly situated;

(g)     An award of pre-judgment and post-judgment interest;

(h)     A trial by jury on all issues triable to a jury; and

(i)     Other and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted this 7th day of November 2025.

THE BROSNAHAN LAW FIRM

Kenneth W. Brosnahan, Esq.
Georgia State Bar No. 086345
E-mail:  kwb@brosnahan-law.com
Linda G. Carpenter, Esq.
Georgia State Bar No. 111285
E-mail:  lgc@brosnahan-law.com
**Attorneys for Plaintiff**

31 Lenox Pointe, N.E.
Atlanta, Georgia 30324
Tel:   (404) 853-8964
Fax:   (678) 904-6391

By:    /s/ Douglas H. Dean
        Georgia Bar No. 130988
        Attorney for Plaintiffs
        Dean Thaxton, LLC
        601 E. 14th Avenue (31015)
        Post Office Box 5005
        Cordele, Georgia 31010
        T:  (229) 271-9323
        F:  (229) 271-9324
        E:  *doug@deanthaxton.law*

By:    /s/ Adam L. Hoipkemier
        Georgia Bar No. 745811
        Attorney for Plaintiffs
        Epps, Holloway, DeLoach
         & Hoipkemier, LLC
        1220 Langford Drive, Bldg. 200
        Watkinsville, Georgia  30677
        T:  (706) 508-4000
        F:  (706) 843-6750
        E:  *adam@ehdhlaw.com*